

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00342-CV

———————————————

BAKER AVIATION, LLC AND BAKER AVIATION MAINTENANCE, LLC,
Appellants

V.

DOUBLE H INTERNATIONAL HOLDINGS, INC., Appellee

---

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-293033-17

---

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

This case involves an Aircraft Lease, Charter, and Management Agreement gone wrong, resulting in dueling breach-of-contract and other claims between an aircraft owner and the company that managed and chartered the plane on the owner's behalf. In seven issues, Appellants Baker Aviation, LLC (Baker)—a full-service aircraft-charter and -management company—and Baker Aviation Maintenance, LLC (BAM)—whose name is self-explanatory—appeal from an adverse judgment following a jury trial and the trial court's rulings on postverdict motions in which the trial court disregarded certain jury findings and entered judgment wholly in favor of Appellee Double H International Holdings, Inc.

We will reverse (1) those parts of the judgment that turn on Double H's position that Baker owed it a fiduciary duty as a matter of law, including the forfeiture award that is based on what we hold is a nonexistent fiduciary duty on these facts; (2) the judgment's erroneous matter-of-law finding that Baker committed the first material breach; (3) the judgment against Baker for fraud; (4) the judgment awarding damages against BAM for negligence; and (5) the award of attorney's fees to Double H, and we will render the judgment the trial court should have on these issues. We will remand to the trial court the issues of Baker's attorney's fees and what to do with the funds that Double H has on deposit with the trial court's registry.

# I. Background

## A. Lead-up to the July 2014 Aircraft Lease, Charter and Management Agreement between Baker and Double H.

Baker was formed in 2008, with Stan Baker as its president,[1] to provide charter services to those looking to rent a plane and management services for aircraft owners. To become a charter operator, an entity such as Baker must be FAA-certified under what is referred to as "Part 135," a comprehensive set of federal aviation regulations covering air charter and commercial operations. *See* 14 C.F.R Part 135. Baker became certified in 2011.

Before deciding in 2014 to buy their own jet, Richard Hall and his father, Lewis Hall, had occasionally chartered aircraft through Baker for their business travel. Already familiar with Stan, the Halls thus approached him for help, and Stan referred them to a broker who ultimately located a 1996 Dassault Falcon 2000 jet. The Halls formed Double H to buy the Falcon from then-owner P51 Holdings, LLC.

The Halls and Stan had discussed the Halls' intent to charter the plane out to others to generate revenue. Richard testified that Stan's projections "basically came out to that we could break even or maybe make a little bit of money" and that Stan represented that the Halls "could reasonably expect" to cover their expenses. Richard confirmed that Stan did not promise that the Halls "were going to make any money."

---

[1]To avoid confusion, we will refer to the human participants by their first names.

Indeed, underscoring the vagaries of the charter business, Double H trial witness Scott Dupree—a pilot who in 2016 took over managing the Falcon from Baker, who had experience in the charter business, and who was part of the buyer group to which the Halls later sold the plane—explained that in the charter business, "[i]f you break even, you're making money."

## B. The Agreement's terms.

At almost thirty pages, the Agreement was comprehensive. Both parties had counsel, and Stan testified that he had seen "this exact same agreement from multiple other charter operators" and that Baker's was "[i]dentical" to theirs.

The Agreement recites that Double H "wishes to lease the Aircraft to Baker Aviation . . . in order for Baker Aviation to conduct charter operations . . . using the Aircraft" and "to otherwise engage Manager [Baker] to provide its services in connection with the management, operation, administration, and maintenance of the Aircraft on [Double H's] behalf and with respect to [Double H's] own operations of the Aircraft." In addition to placing the plane into Baker's charter fleet, Double H also contracted to be able to use it on "Owner Charters"—where Double H would use the plane for its own business purposes—and "Owner Flights"—where Double H (the Halls) would use it for personal travel. The Agreement collectively referred to third-party charters and owner charters as "Charter Flights" and defined "Revenue Flights" as "commercial air transportation provided to third parties."

4

Section 1, defining the "Scope of Agreement," included a provision within subsection 1.1 that "[Baker] shall have full and exclusive possession, use, enjoyment, command and operational control of the Aircraft for each specified [one-year] lease period." Under subsection 1.4, which outlined Baker's management services, Baker agreed to provide "timely billing, revenue collection, recordkeeping, reporting, budgeting and other bookkeeping, accounting and administrative functions as set forth herein or as reasonably requested by [Double H]." Per subsection 7.1, Double H had the right to examine and audit any "financial, flight, maintenance and/or any other records or documents relating to the Aircraft or [Baker's] performance required hereunder (whether financial or operational)."[2]

The following provisions are also pertinent here:

> **2.2.** *Termination With or Without Cause.* . . . [T]his Agreement may be terminated immediately by either Party in the event of a default as specified in <u>Article 10</u> below, or by either Party without cause with thirty (30) days written notice to the other Party.
>
> . . . .
>
> **2.5.** *Effect of Termination.* Any moneys or other property due from either of the Parties to the other shall be promptly paid or delivered to the Party entitled thereto upon the effective date of termination; provided, however, that termination of this Agreement shall not relieve any Party of its obligations in respect of the Aircraft arising prior to the effective date of such termination, whether asserted before or after such termination.
>
> . . . .

---

[2]Double H never exercised its audit rights while the Agreement was extant.

5

**8.1.** *Owner's Payment Obligations.* Within 20 days after the end of each mo[n]th during the [lease term], [Baker] shall deliver to [Double H]: (a) a reasonably detailed accounting statement . . . setting forth and reconciling the amounts payable to each Party during the previous month . . . , including the (i) Operating Costs[3] and Fixed Cost[s],[4] (ii) the Charter Revenues, (iii) net revenues payable to [Double H] in accordance with 8.2.1, . . . and (b) the amount, if any, payable to [Double H] by [Baker] as set forth on such Monthly Statement.

. . . .

**8.2.1.** *Charter Revenue Payment to Owner for Revenue Flights.* For all Revenue Flights operated by [Baker] pursuant to this Agreement, [Baker] shall be entitled to retain 15% of all **"*Charter Revenue*"** defined as the actual flight hours calculated in tenths of an hour multiplied by the hourly charter rate.[5] The balance of the Charter Revenue *plus* the amount . . . of the fuel surcharge bill[6] to the charter customer shall be paid to [Double H].

. . . .

---

[3]"Operating Costs" were defined in subsection 8.1.1 as including fuel costs, maintenance costs, service-program hourly costs, and any costs of complying with applicable regulatory requirements.

[4]Subsection 8.1.2 defined "Fixed Costs" as comprising $3,000 in monthly management fees, $3,000 per month for hangar storage, nearly $39,600 for monthly pilot salaries and benefits, any actual cost of required flight-crew training, and almost $23,600 for an annual insurance premium.

[5]Baker's expert testified that "85-15 is a pretty standard split" in the charter industry and that calculating and paying based on "actual flight hours" is a "pretty typical agreement" for "pure charter."

[6]Because Double H had to pay all fuel costs under the Agreement no matter who was using the plane, in order to ameliorate those costs to Double H, Baker had third-party charter customers pay a fuel surcharge designed, ideally, to meet or exceed the actual fuel cost, the price of which—like gasoline—is highly variable even over short amounts of time. Stan testified that the purpose of the fuel surcharge, "an industry-wide mechanism," is "simply to lower the impact of high fuel prices to the aircraft owner."

6

**10.1.** *Events of Default.* As part of and in addition to the termination rights set forth in Article 2 above, this Agreement may be terminated immediately upon written notice by the non-defaulting party in the event of any of the following **"*Events of Default*"**:

Failure by either Party to make payments due hereunder within thirty (30) days after receipt of written notice from the other party;

Violation by either Party of any other term, representation or warranty set forth in this Agreement at any time during the Term, together with a failure to cure within seven (7) days after receipt of written notice of such violation; . . .

**10.2.** *Remedies.* Upon an Event of Default[,] the non-defaulting party shall have the right, but not the obligation, to:

Immediately terminate this Agreement upon written notice to the other party;

Declare immediately due and payable all sums owed the other party to it under this Agreement;

. . . .

Pursue any other remedy now or hereafter available at law or in equity.

In the event a Party takes any action pursuant to this Section, such Party shall be entitled to recover its reasonable attorneys' fees and expenses.

. . . .

**16. No Partnership**

Nothing herein contained shall be deemed to create a joint venture or partnership between the Parties. All persons furnished by [Baker] for the performance of services or work under this Agreement shall at all times and for all purposes be considered [Baker's] employees or agents . . . .

**C. During the prepurchase inspection, which BAM conducted for Double H, a portion of a wing's leading edge is damaged; BAM covers all the repair costs; Double H closes its purchase from P51.**

7

Double H used BAM to inspect the Falcon before completing its purchase in August 2014. During the inspection process, the leading edges of the wings were heated as part of a test, but some overheating resulted in buckling on a portion of one of them. BAM assumed all responsibility for making the needed repairs, at its cost, and Double H and P51 agreed that the damage would not be considered a "Discrepancy" under their contract. The "Aircraft Repair Sideletter Agreement" signed by Double H, P51, and BAM contained no downward adjustment to the original sales price, and nothing in the record otherwise suggests that Double H renegotiated the sales price because of this incident. At trial, Richard agreed that he had signed a release—the sideletter agreement—covering the leading-edge issue.

### D. While awaiting FAA approval for Baker to add the Falcon into its Part 135 charter program, Double H has some modifications made to the plane and uses it in the interim for Owner Flights, which do not need a Part 135 certification.

Before approving a plane for Part 135 use, the FAA conducts a "very major [structural] inspection" that includes the "fuselage, wings, tail, landing gear, basically the entire aircraft," a process that can—and did here—take "months." That process had not been completed when, in October 2014, Double H decided to have winglets installed to help with fuel efficiency and add extra lift, which would allow the plane to more easily use smaller airports.

Because Baker was not among the few shops in America authorized to install the winglets purchased by Double H, Baker outsourced the work to West Star

Aviation in Illinois and arranged for a one-time FAA ferry permit to transport the plane.[7] When the plane arrived at West Star, an overweighting condition based on improperly secured ballast was discovered. After consulting with Dassault (the Falcon's manufacturer), West Star inspected the potentially affected areas and provided Baker with logbook entries saying that it had found "no faults" and "no defects." According to Stan, there was no "damage" to the plane as that word is commonly understood in the aviation industry.[8] Thus, although Baker's trial position was that it had no contractual duty under subsection 4.4.4 of the Agreement to notify Double H "if the Aircraft . . . is damaged"—because there was no damage to disclose—Stan stated that he told Double H of the occurrence in a phone call to Lewis (who did not testify at trial). Richard testified that Double H first learned of the West Star incident after filing suit.

For most of 2015, while Baker was awaiting Part 135 certification for the Falcon, the Halls used the plane "pretty often"—some 200 hours altogether—for

_____

[7]A ferry permit is required when flying an aircraft that is not in its normal condition. The Falcon was not in its normal condition at that time because it did not have an interior in it due to the Halls' having decided to refurbish the interior, including changing the carpeting—a seemingly small change that required resubmitting paperwork to the FAA and caused further delay in the Part 135 approval. Richard agreed that Double H's modifications were partly to blame for the Part 135 certification's being delayed until late in 2015.

[8]BAM's director of maintenance testified that although some nonmajor floorboard repairs were made, "[f]loorboards are not structural" and thus that type of repair is not "structural damage to the aircraft that needs to be reported to the FAA."

personal business and vacation travel and paid Baker the cost of these Owner Flights per the Agreement. In late 2015, the plane received its Part 135 certification and was then available for charters; the first charter flight occurred in December 2015. Between then and June 2017, Baker used the Falcon for a total of 71 charter flights.

**E. Double H begins falling behind on payments as early as March 2016; Baker continues to use the plane in its charter program but eventually files a lien against the plane for unpaid invoices; Double H terminates the Agreement without cause in June 2017 and sues shortly afterward.**

Double H did not pay Baker's February 2016 invoice, for which payment was due 20 days later under the Agreement, marking the first time Double H did not timely pay a bill. From July 2016 on, Baker's invoices to Double H remained "pretty consistently" unpaid.[9] Stan testified that he discussed the unpaid invoices with Richard several times and that Double H never disputed the billed amounts or raised any dissatisfaction with Baker as a reason for not paying those invoices. Stan also testified that Richard told him that "the reason he was not paying invoices was due to financial difficulties." There were "[n]o complaints throughout the entirety of the relationship," according to Stan, a statement that's roughly consistent with Richard's

---

[9]Stan testified that the Halls were among a group of several business partners who had a total of three aircraft chartered with Baker and that the relationship among those business partners in mid-2016 seemed to be "deteriorating."

testimony that Double H learned of Baker's alleged breaches of contract and other alleged misconduct only after it filed this lawsuit.[10]

Because of Double H's accrued unpaid bills, Baker filed a lien against the Falcon to ensure payment. Then on June 21, 2017, Double H's lawyer sent its "notice of termination of the Aircraft Lease, Charter, and Management Agreement without cause pursuant to paragraph 2.2" and filed suit less than two weeks later.

Double H's original petition, filed on July 3, 2017, alleged—among other things—that Baker had "wrongfully and tort[i]ously" retained possession of the plane and placed the lien after knowing of Double H's "multiple complaints and concerns and its desire to terminate the Agreement."[11] By then, Double H's outstanding balance owed to Baker had ballooned to $382,464.20, as shown on Baker's July 7, 2017 invoice. An August 4, 2017 final invoice to Double H added another $11,701.76—consisting of the $3,000 monthly hangar fee, maintenance expenses, and pilot severance pay—bringing Double H's debt to $394,165.96.

---

[10]Richard did testify, without elaboration, that Double H had complained about "how the bills were starting to get larger and what was the reason for that." He also testified that he had spoken with Stan about the outstanding balance and said that "if we weren't going to make money, we weren't going to continue to charter," in contrast to Dupree's earlier-quoted testimony: "If you break even, you're making money . . . [i]n the charter business."

[11]At trial, Stan testified that at the time of placing the lien—a time when he perceived that the Halls "seem[ed] to have financial problems"—he was unaware that Double H was disputing anything about the billings: "I didn't know there was going to be a dispute until they filed a lawsuit." Baker released its lien when Double H deposited $382,464.20 into the court's registry in August 2017.

**F. Claims and counterclaims; the charge and the jury's verdict.**

After being sued, Baker counterclaimed for the unpaid invoices, alleging breach of contract, quantum meruit, and unjust enrichment and seeking a constructive trust and its attorney's fees. Double H's live pleading at the time of trial included claims against Baker for breach of fiduciary duty, breach of contract, fraudulent inducement, invalid lien,[12] and attorney's fees, and a claim against BAM for negligence.[13]

A four-day jury trial ensued in November 2021. Double H argued for damages consisting of—

- $466,358.01 comprising disputed charter revenue ($232,387.64)[14] and disputed fuel costs ($233,970.37) spanning the December 2015 charter flight through the final one in June 2017;

---

[12]The jury found in Baker's favor on that claim.

[13]Double H had also sued BAM for fiduciary-duty breach and Stan and his sister Angela—who handled Baker's charter sales—individually, but because those claims were dropped before the case went to the jury, we need not further mention them.

[14]Part of Double H's damage summary included a total of $76,100 in overnight fees that charter clients paid Baker when a trip was not a one-day turnaround. Double H claimed that Baker should have included those overnight fees when calculating the Charter Revenue to which Double H was entitled to 85%, but the Agreement defined Charter Revenue simply as "the actual flight hours calculated in tenths of an hour multiplied by the hourly charter rate." The Agreement said nothing about Baker's having to account for or share any non-Charter Revenue payments such as overnight fees or anything else Baker received beyond actual flight hours calculated in tenths of an hour multiplied by the hourly charter rate (plus the fuel surcharge).

- $223,150.94 in maintenance-log-system ("CAMP")[15] charges and maintenance charges for which Double H could not find complete maintenance-log records,[16] spanning September 2014 through Summer 2017;

- $144,000, representing the alleged diminution-in-value difference between what Double H expected to receive from selling the Falcon and what the buyer paid;[17] and

- $354,111.67 in charges from August 2014 through June 2017 consisting of the $3,000 monthly management fee paid to Baker from the Agreement's inception; hangar fees during times when the plane was at West Star, not at Baker;[18] monthly charges for wiping down and cleaning the plane and for stocking it with drinks; several expenses exceeding $10,000 that required prior written approval; and certain other miscellaneous expenses.

---

[15]CAMP is an acronym for Continuous Airworthy Maintenance Program.

[16]Baker's director of maintenance had offered, at no cost, to correct any logging errors that could be identified—a process that he testified could be done in a day—but Double H declined.

[17]Double H sought this diminished-value amount not only as damages for BAM's negligence but also as one of the six identical categories of contract and fraud damages against Baker.

[18]Stan testified that the $3,000 monthly hangar fee was a flat cost from which Baker was not contractually called upon to deduct, say, $100 if the plane was elsewhere one day out of thirty.

Thus, Double H sought total damages of $1,187,620.62. On Baker's breach-of-contract counterclaim, Baker sought the amount of Double H's unpaid bills: $394,165.96.

The jury charge included questions asking whether Baker had breached the Agreement (Question 1); if so, whether its breach had been excused by Double H's prior material breach (Question 2); a conditional contract-damages question with six components[19] but a single line for a dollar amount (Question 3); whether Baker had committed fraud by misrepresentation and, if so, a damages question with those same six components (Questions 4 and 5); and a question asking whether Baker had complied with its fiduciary duty to Double H and instructing the jury that "[b]ecause a relationship of trust and confidence existed between them, as [Double H's] agent, Baker owed [Double H] a fiduciary duty" (Question 7). Baker objected to that instruction "because it presumes that an agency relationship exists and presumes that a relationship of trust and confidence exists." The charge also asked about BAM's negligence in Questions 8, 9, and 10.

---

[19]Those categories were (1) the difference between the revenue Baker received for using Double H's aircraft and the credit Baker gave to Double H for that use; (2) the aircraft's diminution in value; (3) the reasonable value of Double H's loss of the aircraft's use; (4) the amount of any expenses or charges for the aircraft's maintenance or operation that were not performed or not completely and correctly documented by Baker; (5) the value of unreturned equipment; and (6) the cost to Double H to obtain possession of the aircraft after terminating the Agreement.

14

On Baker's counterclaim, the jury was asked, in Questions 13 through 15, whether Double H had breached the Agreement, whether any breach was excused by Baker's prior material breach, and (conditionally) what Baker's damages were.

Ten of twelve jurors found that both Baker and Double H had failed to comply with the Agreement and that neither side's failure was excused by the other's "previous failure to comply with a material obligation of the same agreement."[20] Without the option to differentiate among Double H's six damages categories, the jury awarded Double H the single sum of $247,762.64 for Baker's failure to comply and awarded Baker the entirety of Double H's unpaid invoices, $394,165.96, for Double H's failure to comply.

The jury further found that Baker had committed fraud, awarding Double H $849.16 in damages, and that Baker did not comply with its fiduciary duty to Double H. The jury found that BAM was negligent and awarded Double H $140,000 on that claim.

**G. The trial court's judgment.**

After a flurry of postverdict motions from both sides, the trial court entered its final judgment. The judgment granted Double H's motion for judgment notwithstanding the verdict (JNOV) by disregarding the jury's finding in Question 14 that Double H's failure to comply with the Agreement was not excused because, in

---

[20]The trial court did not instruct the jury on the meaning of "material."

the trial court's view, Baker's prior material breach—the date or form of which the judgment did not identify—excused Double H's performance as a matter of law. For the same reason, the trial court disregarded the jury's $394,165.96 award to Baker on its counterclaim in Question 15 as "unnecessary." The judgment awarded Double H $247,762.64 as contract damages and $849.16 for fraud, as well as $140,000 for BAM's negligence.

The trial court also granted Double H's postverdict motion for "disgorgement or equitable forfeiture" and ordered that Double H recover an additional $350,000 as "forfeiture of benefits or gains received by Baker, said forfeiture being fair, just and equitable as a penalty for Baker's clear and serious breach of its fiduciary duties to [Double H] as found by the jury." The judgment released to Double H the funds it had deposited into the court's registry and awarded to Double H its attorney's fees and costs. The trial court simultaneously entered findings of fact and conclusions of law on the forfeiture issue.

Baker's and BAM's motion for new trial was overruled by operation of law, and this appeal followed.

## II.    Fiduciary Duty

Baker's first two issues go to the trial court's agreeing with Double H's position that Baker owed it a matter-of-law fiduciary duty that was breached (Issue 1) and ought to forfeit $350,000 for that breach as the trial court ordered (Issue 2). We agree with Baker that the trial court erred by concluding—and by instructing the jury—that

16

"[b]ecause a relationship of trust and confidence existed between them, as [Double H's] agent, Baker owed [Double H] a fiduciary duty." As we discuss below, it did not.

Additionally, or alternatively, because it was disputed, the question of a fiduciary relationship's existence was for the jury to decide, but Double H failed to submit such an issue even after Baker objected to its absence. Our disposition of Issue 1 necessarily resolves Issue 2. Accordingly, we sustain both issues, reverse the fiduciary-breach judgment and the trial court's concomitant forfeiture award, and render judgment for Baker on these issues, as explained below.

### A. The Agreement did not conclusively establish a fiduciary relationship.

The existence of a fiduciary duty is foundational to recovering for its breach. *See Mary E. Bivins Found. v. Highland Cap. Mgmt. L.P.*, 451 S.W.3d 104, 113 (Tex. App.—Dallas 2014, no pet.); *see also Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.—Fort Worth 2011, no pet.) (setting forth elements of fiduciary-breach claim). Texas recognizes two categories of fiduciary relationships: formal and informal.[21] *See Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005). In certain formal relationships—such as those between partners, between attorneys and clients, between realtors and clients, etc.—fiduciary duties are owed as a matter of law. *Johnson v. Bearfoot Cos.*,

---

[21]Double H does not argue, and the trial court did not conclude, that the parties had an informal fiduciary relationship arising from a preexisting relationship of trust and confidence.

17

No. 02-23-00366-CV, 2024 WL 2202033, at \*7 (Tex. App.—Fort Worth May 16, 2024, no pet.) (mem. op.) (citing cases).

Because a fiduciary relationship requires the duty-owing party to place someone else's interests above its own, Texas courts are reluctant to recognize these relationships. *Lindley*, 349 S.W.3d at 124 (first citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992); and then citing *Jones v. Thompson*, 338 S.W.3d 573, 583 (Tex. App.—El Paso 2010, pet. denied)). Particularly in cases involving arm's-length business transactions, "[i]n order to give full force to contracts, we do not create [a fiduciary] relationship lightly." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997); *see also Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998) (rejecting existence of claimed fiduciary duty arising from indemnity agreement that was "an arms-length transaction entered into for the parties' mutual benefit").

Of course, if a contract creates an explicit principal–agent relationship (or one of the other relational forms that enjoy recognized formal fiduciary status), that is a different matter—one far more favorable to a plaintiff—so in defending its judgment Double H proposes that an agency relationship was established as a matter of law because it "was express and undisputed." We can agree neither with these adjectives nor with the trial court's conclusion of law that "[i]t was the agency relationship established by the [Agreement] between [Double H] and Baker that formed the

18

fiduciary relationship which was the basis for the jury's finding of breach of fiduciary duty."[22]

"An agent is one who 'consent[s] to act on the principal's behalf and subject to the principal's control' when the principal has 'authoriz[ed] . . . the agent to act on his behalf.'" *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 343 (Tex. 2023) (quoting *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 691 (Tex. 2017)). "Agency is a relationship which must be proved and cannot be presumed to exist." *Johnson v. Owens*, 629 S.W.2d 873, 875 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.); *see also Buchoz v. Klain*, 184 S.W.2d 271, 271 (Tex. 1944) ("The law does not presume agency, and he who alleges it has the burden of proving it."). The "critical element of agency" is the principal's right to control the agent's actions. *Maida Dev., LLC v. Tarantino Props., Inc.*, No. 07-16-00014-CV, 2016 WL 4135050, at *4 (Tex. App.—Amarillo Aug. 2, 2016, pet. denied) (mem. op.) (citing *Novam. Steel, Inc. v. Delta Brands, Inc.*, 231 S.W.3d 499, 511 (Tex. App.—Dallas 2007, no pet.), and also noting that mere subjective trust in another does not alone indicate a fiduciary relationship). In connection with the control element, "the principal must have control of both the

---

[22]We note that "even in an agency relationship . . . , courts take all aspects of the relationship into consideration when determining the nature of fiduciary duties flowing between the parties." *Nat'l Plan Adm'rs v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007). For example, a real-estate agent is a fiduciary when handling a client's property sale but not necessarily when arranging for a maid service to spruce up the house ahead of time or when asking what the purchaser might pay to retain the seller's patio furniture.

means and details of the process by which the agent is to accomplish his task in order for an agency relationship to exist." *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 829 (Tex. App.—Dallas 2010, no pet.).

Here, the trial court erred by concluding that the Agreement expressed or evinced an agency relationship that was fiduciary in nature. We can look to the Agreement's Section 16 for the basics of Double H's and Baker's relationship: "Nothing herein contained shall be deemed to create a joint venture or partnership between the Parties. All persons furnished by [Baker] for the performance of services or work under this Agreement shall at all times and for all purposes be considered [Baker's] employees or agents . . . ." Neither this provision nor any other set Baker up as Double H's agent, impressed with a legal duty to place Double H's interests above its own.[23] Indeed, Section 16 undercuts Double H's position: it makes plain that those working with, for, or on Baker's behalf were *Baker*'s agents. Moreover, when asked to

---

[23]And if such a duty had existed, nothing indicates its proscribed limits. Must Baker have favored steering clients to Double H's aircraft for charter flights, as opposed to one of the other planes Baker had under similar contract? At oral argument, Double H answered no to that broad question and posited more narrowly that the Agreement's provisions requiring Baker to disclose and account for charter revenues and other funds yielded a fiduciary obligation to do so fully and correctly—candidly conceding, however, that drawing the line between pure breach of contract and breach of fiduciary duty was difficult. Particularly given Texas courts' reluctance to impose fiduciary duties when none are explicit and when a contract is at arm's length, we are untroubled in concluding that the remedies for accounting or payment flaws are here grounded entirely in contract. "[A] contractual obligation does not generally give rise to a fiduciary duty." *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 203 (Tex. 2002).

identify "any [specific] provision in that contract that creates a fiduciary relationship," Richard could not do so, conceding that there was "not specifically a fiduciary duty" in the Agreement.

The Agreement placed Baker—not Double H—squarely in charge of a breadth of matters: during the lease term, Baker had "full and exclusive possession, use, enjoyment, command and operational control of the Aircraft"; Baker "retain[ed] the ultimate authority and responsibility for hiring and use of any Flight Crew" in its charter operations; and the flight crew "remain[ed] the employees, independent contractors[,] or agents of [Baker]." True, Double H had the contractual right to say yes or no to proposed charter flights or to proposed repairs exceeding a certain amount, but that is a far cry from exerting the type of control needed to establish a principal–agent relationship as a matter of law. *See, e.g.*, *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 607–08 (Tex. 2002) (discussing control element, which plaintiff alleged that premises owner possessed over contractor whose negligence caused injury, and stating that "it is not enough that the premises owner has merely a general right to order the work").

And it is of no help to Double H that its contracting counterparty had superior knowledge of the aviation industry and promised to account for revenue and expenses under the Agreement. People enter arm's-length contracts every day assuming that others to whom business is entrusted will live up to their promises; all things being equal, a disappointed party's remedy is to seek damages for breach of those

21

contractual promises. *See In re Est. of Kuykendall*, 206 S.W.3d 766, 771 (Tex. App.—Texarkana 2006, no pet.) ("The mere fact that one subjectively trusts another does not, alone, indicate that confidence is placed in another in the sense of a fiduciary duty.").

Because the Agreement did not create a fiduciary duty to disclose and account correctly to Double H—which had unfettered audit rights—or to generally place Double H's economic interests above Baker's own, the trial court erred in its fiduciary-breach legal conclusion and judgment.

## B. Double H did not seek a jury finding on the duty's existence.

Neither the Agreement nor the record shows an "express" fiduciary relationship as a matter of law, as we explained above, and it was not "undisputed," in Double H's framing, that Baker was Double H's fiduciary. Without a matter-of-law fiduciary relationship, Double H had the burden to obtain a favorable jury finding on one's existence.[24] *See Nat'l Plan Adm'rs*, 235 S.W.3d at 700–04; *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 794 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (op. on reh'g) ("If the existence of a formal fiduciary relationship is disputed, then a question should be submitted in the jury charge inquiring whether the formal fiduciary relationship existed at the time of the transaction at issue, or with respect to the

---

[24]We include this alternative reason for reversing the fiduciary-breach aspects of the judgment but stress that our primary reason lies in the Agreement's not creating an agency relationship giving rise to a fiduciary duty as a matter of law, which was the trial court's stated legal conclusion underpinning the judgment.

transaction at issue, or both."). Even after Baker raised the issue during the charge conference—objecting to the trial court's instruction that "Baker owed Double H a fiduciary duty" because the instruction presumed an existing relationship of trust and confidence—Double H declined to submit a question on which it had the burden of proof and did not object to its omission. That strategy has consequences.

"[W]hen a disputed and essential issue is omitted over the objection of a party, the appellate court must find that the [other] party waived that element and by so doing did not meet the burden placed on him by law." *Winfield v. Renfro*, 821 S.W.2d 640, 657 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (op. on reh'g). An objection such as Baker's "places the burden of submitting a correct question on the party with the burden of proof, . . . and the result of that party's failure to submit a correct question after objection is waiver of the ground of relief." *Mangum v. Turner*, 255 S.W.3d 223, 227 (Tex. App.—Waco 2008, pet. denied); *see also Chambers Cnty. v. Pelco Constr. Co.*, No. 01-18-00832-CV, 2020 WL 7776078, at *14 (Tex. App.—Houston [1st Dist.] Dec. 31, 2020, pets. denied) (mem. op. on reh'g) ("Because Chambers County properly objected to the omission of a condition-precedent question, Pelco, having failed to submit such an issue after objection, has waived its recovery for breach of the contract."). Double H waived breach of fiduciary duty as a ground of relief by failing to submit the threshold issue—whether the duty existed—despite Baker's alerting Double H and the trial court to this missing element. We sustain Baker's first issue.

23

**C. The trial court's forfeiture award falls by the wayside.**

In its second issue, Baker argues that the trial court erred by ordering it to forfeit $350,000 to Double H as a remedy for Baker's "clear and serious" breach of fiduciary duty. In light of our conclusion that the fiduciary-breach judgment must be reversed, we need not detail Baker's analysis of the forfeiture-related arguments because Double H cannot recover anything for an alleged breach of a nonexistent duty, and we sustain Baker's second issue. *See* Tex. R. App. P. 47.1 (stating that the appellate court must hand down a written opinion as brief as practicable but that addresses every issue raised and necessary to the appeal's final disposition).

## III.    Baker's Contract Claim; Prior Material Breach

Our resolution of Baker's third issue exemplifies the dangers of not securing a jury finding about which party committed the first material breach when both sides point fingers at the other for not complying with a contract. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004) (noting that problems with competing contract-breach claims can be avoided by instructing the jury "to decide who committed the first material breach"). The jury here found that Double H failed to comply with the Agreement and that Double H's failure to comply was not excused by Baker's prior material breach, which the jury charge described, for each side, as a "previous failure to comply with a material obligation of the same agreement." In answer to Question 15, the jury awarded Baker $394,165.96 for

Double H's breach. But in the judgment, the trial court granted Double H's motion to disregard the jury's answer to Question 14, stating:

> Based upon the jury's answers and the evidence heard by the Court, the Court determines that the jury's answer to question No. 14 should be disregarded, it being the judgment of the Court that the evidence shows and the jury's answers to questions 1, 2 and 3 confirm that *[Double H's] performance was excused as a matter of law because [Baker's] prior material breach of the agreement excused [Double H's] performance of the same agreement* contrary to the jury's answer to question No. 14. Accordingly, the jury's answer to question no. 14 is disregarded as well as the jury's answer to question no. 15, the answer to question no. 15 being unnecessary for the jury to have answered in light of the Court's determination that its answer to question 14 was contrary to law under the evidence admitted by the Court. [Emphasis added.]

That ruling left the trial court free to enter judgment based on the jury's mirror-image findings that Baker had breached the Agreement and that Baker's breach was not excused by Double H's prior material breach. The trial court did not specify what it considered to have been Baker's prior material breach nor when that breach occurred.

## A. Applicable law

Upon a party's motion and reasonable notice, a trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the movant's

25

right to judgment or negates the opponent's right or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 454 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g).

To determine whether the trial court erred by rendering a JNOV, we test legal sufficiency by viewing the evidence in the light most favorable to the verdict. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). This means we must credit evidence favoring the jury verdict if reasonable jurors could and must disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009); *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007). We will uphold the trial court's JNOV if no evidence supports the jury's finding on a vital fact or if the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). "[E]very reasonable inference deducible from the evidence is to be indulged in" support of the jury's finding. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

**B. Analysis**

Here, without a jury finding on which party first materially breached the Agreement, the jury's findings favorable to Double H give us no information from which to deduce that Double H proved, as a matter of law, the affirmative defense

that Baker materially breached first. *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (noting that materiality of a contract breach is ordinarily a fact issue and may be decided as a matter of law only if reasonable jurors could reach only one verdict and also noting that nonmaterial breach does not excuse the other party from future performance but gives rise only to a claim for damages); *Earth Power A/C & Heat, Inc. v. Page*, 604 S.W.3d 519, 524–25 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (stating that prior material breach is an affirmative defense that must be pleaded and proved and holding that party's failure to submit jury question on materiality of other party's alleged breach waived the defense where prior material breach was not conclusively proved).

Double H's contract-damages categories spanned different time periods, alleged different breaches, and sought to recover different amounts. Although Double H argues that the jury's global damages award of $247,762.64 in answer to Question 3 must have reflected Baker's charter-revenue underpayments that began in December 2015—and thus necessarily a prior material breach by Baker predating Double H's own breaches—neither the record nor the verdict bears that out, for several reasons.

First, Double H's Exhibit A1-A laid out a total of $466,358.01 in disputed charter revenue ($232,387.64) and disputed fuel costs ($233,970.37). Neither amount matches the jury's answer to Question 3, so we would be speculating to conclude that the jury's award was based entirely on any part of Exhibit A1-A. *See Drury Sw., Inc. v.*

27

*Louie Ledeaux #1, Inc.*, 350 S.W.3d 287, 292 (Tex. App.—San Antonio 2011, pet. denied) (op. on reh'g) (holding that "a reviewing court is not permitted to speculate on how the jury actually arrived at its award.").

Second, Double H argued for other contract damages that likewise differed from the $247,762.64 award: (a) $223,150.94 in total CAMP charges and unverified maintenance charges from September 2014 forward, as shown on Double H's Exhibit B; (b) $354,111.67 in charges from August 2014 through June 2017 consisting of the $3,000 monthly management fee, along with other charges that Double H disputed and that it summarized in its Exhibit C; and (c) $144,000 for the plane's diminished value. Again, pointing to any of this as *conclusive* evidence of Baker's prior material breach is unmerited under the appropriate standard of review.

Third, because the jury's award to Double H was significantly less than the over $1 million in collective contract damages it sought through the end of the parties' relationship in the summer of 2017, it is impossible to say with any confidence how much, if any, of those damages were incurred before Double H's presumed March 2016 breach[25]—or at any particular point in time, for that matter—much less whether Baker breached the Agreement in a material way before Double H did. We sustain this part of Baker's third issue.

---

[25]From the jury's awarding Baker the entire $394,165.96 of Double H's indebtedness, we can deduce that Double H's first material breach probably came when it failed to timely pay the February 2016 invoice by March 20, 2016.

When a trial court errs by entering a JNOV or disregarding a jury finding, we generally reverse and render judgment unless the appellee presents by cross-points grounds sufficient to vitiate the jury's verdict or to prevent an affirmance of the judgment had one been entered on the verdict. *Dudley Constr., Ltd. v. Act Pipe & Supply, Inc.*, 545 S.W.3d 532, 538 (Tex. 2018); *see also Wal-Mart Stores, Inc.*, 102 S.W.3d at 710; *Jackson v. Ewton*, 411 S.W.2d 715, 717 (Tex. 1967). Because Double H did not present any such cross-points, rendition on Baker's third issue is the appropriate result. But it follows that the appropriate resolution of the competing contract damages is to net them out, rather than stripping Double H of a recovery altogether, because Baker does not argue that Double H's breach was not excused as a matter of law—or, put differently, Baker does not argue that Double H committed the first material breach as a matter of law. Because Rule 43.2(c) authorizes us to render the judgment that the trial court should have entered, we will render judgment that Baker recover $146,403.32 ($394,165.96 − $247,762.64) in contract damages.[26] *See* Tex. R. App. P. 43.2(c).

Baker also asks, as part of its third issue, that we remand the limited issue of its entitlement to attorney's fees under Sections 10.1 and 10.2 of the Agreement, which in light of our holding we will do.

---

[26]Baker's motion for judgment in the trial court sought that net amount.

## IV. Double H's Fraud Claim

In its fourth issue, Baker asserts that the judgment awarding Double H $849.16 for Baker's fraud lacked legally sufficient evidence to support the jury's liability finding. We agree.

### A. Standard of review; applicable law

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). We consider the evidence under the same standard set out above for reviewing the JNOV. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827. That is, we indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). But when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

30

## B. Analysis

Although a party can commit fraud by nondisclosure, *see, e.g.*, *Schlumberger Tech.*, 959 S.W.2d at 181, and although Double H's live pleading asserted—and much of its focus at trial involved—a "failure to disclose," Double H presented to the jury, through the charge, only the theory that Baker had knowingly or recklessly made material misrepresentations, intending that Double H act on them and on which Double H relied to its detriment. The jury was not charged on fraud by omission or failure to disclose. The charge defined "misrepresentation" as (a) a false statement of fact; or (b) a promise of future performance made with an intent, at the time the promise was made, not to perform as promised; or (c) a statement of opinion based on a false statement of fact; or (d) a statement of opinion that the maker knows to be false; or (e) an expression of opinion that is false, made by one who has, or purports to have, special knowledge of the subject matter of the opinion. "Special knowledge" was in turn defined as knowledge or information superior to that possessed by the other party and to which the other party did not have equal access. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business* PJC 105.2, 105.3A–105.3E (2018).

The supreme court has interpreted "special knowledge" to mean knowledge of specific facts that underlie a false opinion and has held that this can support an affirmative-misrepresentation claim. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930–31 (Tex. 1983) (holding that real-estate developer's knowingly false and specific assurances to

land developer that nearby trailer park had been sold and would soon be closing went beyond nonactionable opinion or prediction). The speaker must be saying something that he knows to be false and must be giving an opinion based on those known false facts. "Special or one-sided knowledge may support the conclusion that a statement is one of fact, not opinion, and the comparative levels of the speaker's and the hearer's knowledge are relevant considerations in determining the nature of the statement." *S. Cent. Jurisdictional Conf. of United Methodist Church v. S. Methodist Univ.*, 674 S.W.3d 334, 378 (Tex. App.—Dallas 2023, pet. filed) (citing *Italian Cowboy Partners v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 338 (Tex. 2011)); *see also Nancarrow v. Whitmer*, 463 S.W.3d 243, 252 (Tex. App.—Waco 2015, no pet.) ("[P]redictions about the future that are made with present knowledge that the statements are false are actionable misrepresentations."). Whether expressing an opinion about a future event's happening constitutes fraud requires taking into account such "[r]elevant circumstances" as "the statement's specificity and the comparative levels of the speaker's and the hearer's knowledge." *Paull v. Cap. Res. Mgmt., Inc.*, 987 S.W.2d 214, 219 (Tex. App.—Austin 1999, pet. denied) (citing *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995)). On the other hand, pure expressions of opinion will not support a fraud claim. *Faircloth*, 898 S.W.2d at 276; *Trenholm*, 646 S.W.2d at 930.

In its opening statement, Double H forthrightly informed the jury that Baker never promised that Double H would make money or break even, only that breaking

even was a "reasonable expectation." Richard described the prepurchase conversation with Stan similarly:

> Q. Okay. And did Stan Baker make any representations to you and your father about what to expect in terms of revenue once the plane started being chartered?
>
> A. Yes. We -- Actually, before we ever even bought the plane, we came to Stan's office and set down with him, and he had on his computer worked up some, you know, basic projections and the -- the projections basically came out to that we could break even or maybe make a little bit of money.
>
> Q. Okay. And Mr. Baker didn't -- you heard me tell the members of the jury -- didn't promise you you were going to make any money, did he?
>
> A. No.
>
> Q. But he represented to you that you could reasonably expect that you were going to cover your expenses?
>
> A. Yes.[27]

We conclude that these statements do not rise to the level of fraudulent misrepresentation—that is, that Stan knew he was lying or spoke recklessly when telling Richard that he could expect to break even or that Stan made some *specific* statements from a position of superior knowledge—but were instead mere predictions or opinion. Nothing in the record establishes that Stan misrepresented or recklessly opined about what Double H could reasonably expect to receive from charter income,

---

[27]Stan testified that the discussion about projections did not occur until 2016, years after Double H bought the Falcon, explaining that "[f]inances did not seem to be an issue" at first and that the Halls "had a lot of money."

nor did Stan testify about comparable experience with other clients' charter operations and revenue. We sustain Baker's fourth issue.

## V. BAM's Negligence; Damages

In a fifth issue, BAM argues that the negligence judgment should be reversed for several reasons, including that Double H's diminution-in-value evidence was legally insufficient—the applicable review standard we have recited above—to support the $140,000 award in the judgment. As set out below, we agree with BAM on this sub-issue and thus need not reach its arguments on the economic-loss rule or release. *See* Tex. R. App. P. 47.1.

### A. Applicable law on owners' value opinions

A corporate representative of an entity that owns personal property is competent to opine on the property's value, but only "as long as he testifies about matters within his knowledge." *Taiwan Shrimp Farm Vill. Ass'n, Inc. v. U.S.A. Shrimp Farm Dev., Inc.*, 915 S.W.2d 61, 71 (Tex. App.—Corpus Christi–Edinburg 1996, writ denied). The Texas Supreme Court later expanded on this notion:

> We hold that the Property Owner Rule is limited to those witnesses who are officers of the entity in managerial positions with duties related to the property, or employees of the entity with substantially equivalent positions and duties. Further, the Property Owner Rule falls within the ambit of Texas Rule of Evidence 701 and therefore does not relieve the owner of the requirement that a witness must be personally familiar with the property and its fair market value, but the Property Owner Rule creates a presumption as to both.

34

*Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 849 (Tex. 2011);[28] *see Custom Transit, L.P. v. Flatrolled Steel, Inc.*, 375 S.W.3d 337, 352–53 (Tex. App.—Houston [14th Dist.] 2012, pets. denied) (noting appellant's concession that corporate owner seeking diminished-value damages for improperly stored steel coils was qualified to opine on damages as owner who occupied managerial position with duties related to the coils and as one personally familiar with market value of prime versus less-than-prime steel).

Not long after *Speedy Stop*, the supreme court provided further guidance, holding that property-owner testimony, as the "functional equivalent of expert testimony," cannot establish valuation based "solely on a property owner's *ipse dixit.*" *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012). "An owner may not simply echo the phrase 'market value' and state a number to substantiate his diminished[-]value claim; he must provide the factual basis on which his opinion rests." *Id.*; *see also Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014) (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009), in explaining that an opinion is conclusory if "no basis for the opinion is offered" or "the basis offered provides no support").

---

[28]In *Speedy Stop*, the supreme court noted that although the valuation affiant had experience, knowledge, and expertise in real-estate values generally and was generally familiar with the store's business operations, he did not demonstrate his personal familiarity with the store property at issue and its fair market value, and thus the trial court did not abuse its discretion by excluding his damages opinion under Rule of Evidence 701. 337 S.W.3d at 852.

**B. Analysis**

Double H's responsive briefing on appeal clarifies that (despite much talk at trial about the pre-purchase leading-edge damage) it sought damages only for the overweighting issue and asserts without further analysis that "witnesses testified that the loss in value was $140,000, which is consistent with the jury's verdict." But Richard was the only witness to put a dollar figure on the claimed diminution in value; Dupree, who later managed the aircraft and helped sell it, testified that "the buyer paid less for the airplane than they would have absent the damage" but did not quantify that allegedly lesser amount.

Richard testified that (1) he had to disclose the damage history to the eventual purchaser, who paid $3 million for plane; and (2) after disclosing that history, he received "[a]bout $144,000" less than he expected. But Richard also testified that he had had "no experience in owning or operating an aircraft" and agreed that he was "not an expert in aircraft valuation," was "not an expert in the diminution of value or the loss of value as a result of damage to an aircraft," and was "not an expert in assessment of damages." We thus hold that Richard's testimony was legally insufficient to support the $140,000 jury verdict and judgment for BAM's negligence. *See City of Keller*, 168 S.W.3d at 812–13. We sustain the appellants' fifth issue.

## VI.    The Attorney's-Fees Award to Double H

Baker's sixth issue challenges the trial court's judgment awarding Double H over $190,000 in reasonable and necessary attorney's fees, arguing that Section 10 of

the Agreement trumps Section 38.001 of the Texas Civil Practice & Remedies Code. *See* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3278–79 (amended 2021) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 38.001) ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract."). We agree that, based on our analysis above, Double H is not entitled to recover its attorney's fees under the Agreement, and because its breach-of-contract claim is the only one that would allow for an attorney's-fees recovery, we sustain Baker's sixth issue.

## A. Applicable law

Texas follows the "American Rule," which calls for each party to pay its own way in attorney's fees "unless authorized by statute or contract." *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding); *see also Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011) (explaining that attorney's-fees award must be "specifically provided for by statute or contract"). Although Civil Practice and Remedies Code Section 38.001 authorizes an attorney's-fees recovery in a claim for breach of contract, "[p]arties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's." *Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). When a contract provides for a standard that differs from Chapter 38, courts will apply the parties' chosen metrics in deciding whether to

award attorney's fees. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 485 (Tex. 2019).

### B. Analysis

The Agreement contains a provision addressing attorney's fees that is tied to several detailed "Events of Default" within Section 10. One of those events in subsection 10.1—and the only one theoretically applicable here to support Double H's recovery—is "[v]iolation by either Party of any other term, representation or warranty set forth in this Agreement at any time during the Term," although that sentence has a condition: "together with a failure to cure within seven (7) days after receipt of written notice of such violation." Subsection 10.2 of the Agreement goes on to provide that "[u]pon an Event of Default, the non-defaulting party shall have the right . . . to . . . [p]ursue any other remedy now or hereafter available at law or in equity" and "[i]n the event a Party takes any action *pursuant to this Section*, such Party shall be entitled to recover its reasonable attorneys' fees and expenses." [Emphasis added.] To recover attorney's fees, then, Double H must have taken legal action because of a specific event of default; a general claim for breach of contract in and of itself does not fall within the Agreement's terms.

Although Double H's contract claim asserted a series of alleged violations, to constitute a defined event of default, Double H had to have given Baker written notice of the Agreement's violation and allowed Baker a seven-day cure period. In its two-paragraph response to Baker's sixth issue, Double H does not claim to have ever

38

given Baker notice and right to cure, nor does it contend that some other subsection 10.1 event of default existed that would allow for its attorney's fees. Indeed, its only response to Baker's contract-based analysis is to claim entitlement to attorney's fees "based on multiple theories, including under the Agreement due to Baker Aviation's breach, pursuant to section 37.009 of the Texas Civil Practice & Remedies Code (Uniform Declaratory Judgments Act),[29] and pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code." We find Double H's argument unpersuasive and sustain Baker's sixth issue.

## VII. Partial Remand

Baker's seventh and final issue seeks a partial reversal and remand "to the extent the attorney fee award to Double H is not reversed and rendered." Based on our disposition above, Double H is not entitled to recover attorney's fees. Thus, we overrule as unnecessary this part of Baker's final issue. *See* Tex. R. App. P. 47.1.

We will sustain the part of Baker's final issue that asks for a remand so that the trial court can reconsider its order that the funds currently held in the court's registry should be released to Double H.

---

[29]Double H's only declaratory-judgment claim involved its assertion that Baker's lien was invalid and unenforceable, but the jury did not find that the lien was invalid and the final judgment did not include any declaratory relief.

39

## VIII. Conclusion

Having sustained Baker's dispositive issues, we reverse the trial court's judgment and render judgment that Double H take nothing on its breach-of-fiduciary-duty claim, on its fraud claim, on its negligence claim against BAM, and on its claim for attorney's fees. We render judgment that Baker recover $146,403.32 on its breach-of-contract claim and remand for reconsideration the issues of Baker's entitlement to attorney's fees and Double H's funds in the trial court's registry.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  August 15, 2024